{¶ 1} Relator, Thomas Bozeman, has filed this original action in mandamus requesting this court to issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its order denying his application for permanent total disability compensation, and to enter a new order granting said compensation.
 {¶ 2} This court referred the matter to a magistrate, pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, who issued a decision, including findings of fact and conclusions of law. (Attached hereto as Appendix A.) The magistrate concluded that respondent-commission abused its discretion in determining that relator had voluntarily retired, and that this court should issue a limited writ.
 {¶ 3} No objections have been filed to the decision of the magistrate.
 {¶ 4} Finding no error of law or other defect on the face of the magistrate's decision, we adopt that decision as our own, including the findings of fact and conclusions of law contained in it. Accordingly, we issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate that part of its July 11, 2001 order that determines relator's retirement to be voluntary, and to enter a new determination in a manner consistent with this magistrate's decision.
Writ of mandamus granted.
BRYANT and KLATT, JJ., concur.
 IN MANDAMUS {¶ 1} In this original action, relator, Thomas Bozeman, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him permanent total disability ("PTD") compensation, and to enter an order granting said compensation.
Findings of Fact:
 {¶ 2} 1. Relator has sustained three industrial injuries. His July 30, 1973 injury occurred while he was employed as a welder for respondent The Unisource Corporation, a state-fund employer. On that date, relator fell through a wooden platform landing on both knees. The industrial claim was initially allowed for "acute synovitis of the left knee and dermatitis medicamentous," and was assigned claim number 73-36535. In October 1973, relator obtained new employment with the city of Kent as a "water treatment specialist." This job involved mixing chemicals.
 {¶ 3} 2. In September 1981, the 1973 injury was additionally allowed for "conversion reaction." Apparently, the additional claim allowance was based upon a report from clinical psychologist Thomas O. Hoover, Ph.D., who opined that relator suffered from a "conversion disorder." In his 1981 report, Dr. Hoover stated that relator was temporarily disabled and that with the recommended treatment (psychotherapy) the disability "may be reduced or ended." Dr. Hoover further wrote:
 {¶ 4} "To evaluate the integrity and current effectiveness of intellectual functioning the Wechsler Adult Intelligence Scale was administered. The client's Full Scale I.Q. of 83 indicates functioning within the low average (80 to 89) range of intelligence, as compared with the appropriate age grouping within our general population. The patient's performance is exceeded by 86% of the population in that age grouping. * * *"
 {¶ 5} 3. On May 14, 1986 (almost 13 years postinjury), relator was examined by clinical psychologist and commission specialist David E. Aronson, Ph.D. Dr. Aronson opined: "He should continue psychiatric treatment to maintain his current level of functioning and to maximize probability of continuation in his present job."
 {¶ 6} 4. On January 22, 1995, relator was involved in an automobile accident while employed with the city of Kent. The industrial claim was allowed for "contusion face/scalp/neck, abrasion head, sprain of neck, sprain lumbar region," and was assigned claim number 95-310665. Relator missed only a few days of work following the January 22, 1995 accident.
 {¶ 7} 5. On January 10, 1996, relator was struck by a car at the water treatment plant. This third industrial claim was allowed for "sprain shoulder/arm, left," and was assigned claim number 96-305276. Relator also missed only a few days of work following his third industrial injury.
 {¶ 8} 6. In September 2000, after 27 years of employment with the city of Kent, relator took a regular service retirement through the Public Employees Retirement System ("PERS").
 {¶ 9} 7. On January 12, 2001, relator filed an application for PTD compensation. In support, relator submitted a report, dated December 18, 2000, from his treating psychiatrist Maximilien Menassa, M.D. Dr. Menassa reported:
 {¶ 10} "I have been treating Mr. Bozeman for Conversion Reaction that developed as a result of his 7/30/73 work injury when he fell on both knees while working for Cortez Unisource.
 {¶ 11} "Physical Symptoms: Pain in the left knee radiating to his left leg and ankle. The pain is precipitated by walking, standing, squatting and climbing stairs. The pain is associated with numbness of the left big toe.
 {¶ 12} "Emotional Symptoms: Depression, anxiety, irritability, withdrawal, restless sleep and headaches.
 {¶ 13} "Both physical and emotional symptoms became chronic in spite of orthopedic and psychiatric care.
 {¶ 14} "During 1995, I saw the claimant at intervals of three weeks. During 1996, I saw him at monthly intervals.
 {¶ 15} "The treatment consists of cognitive and supportive psychotherapy, as well as, medication: Sinequan 25 mg b.i.d. for the depression and Stelazine 1 mg 1 to 2 times daily to control the irritability.
 {¶ 16} "The purpose of continued treatment is to improve the quality of life through maintaining the patient's stability and preventing further deterioration of his psychiatric condition.
 {¶ 17} "Treatment will have to continue for an indefinite period of time.
 {¶ 18} "The chronic nature of the pain perpetuates the psychiatric symptoms, creating a vicious circle. The claimant at this point is to be considered permanently and totally disabled as a result of a combination of his physical and psychiatric impairments."
 {¶ 19} 8. In April 2001, at the commission's request, relator was examined for the physical conditions of three industrial claims by Stephen L. Demeter, M.D. Dr. Demeter reported:
 {¶ 20} "ASSESSMENT:
 {¶ 21} "This individual has a fifteen percent (15%) impairment of the whole person. This is based upon four percent (4%) of the whole person for his knee, six percent (6%) for the shoulder, and five percent (5%) for his lumbosacral spine. Zero percent (0%) was assessed for his cervical spine, skin, and head.
 {¶ 22} "This individual has reached maximum medical improvement for all three claim allowances. His physical strength rating form was filled out. He is capable of sedentary work."
 {¶ 23} 9. On April 3, 2001, relator was examined, at the commission's request, by psychologist Steven B. Van Auken, Ph.D. Dr. Van Auken reported: "Overall, the level of impairment found here is in the Class II, or mild category. This is consistent with a fifteen percent (15%) impairment of the whole person, due solely to his allowed psychiatric condition of `conversion reaction.' "
 {¶ 24} 10. Dr. Van Auken also completed an Occupational Activity Assessment report dated April 17, 2001. This form asks the examining psychologist the following two-part query:
 {¶ 25} "Based on the impairment resulting from the allowed/alleged psychiatric/psychological condition(s) only, can this claimant meet the basic mental/behavioral demands required:
 {¶ 26} "[1] To return to any former position of employment?
 {¶ 27} "[2] To perform any sustained remunerative employment?"
 {¶ 28} Dr. Van Auken answered each query in the affirmative.
 {¶ 29} 11. In further support of the PTD application, relator submitted a report, dated May 20, 2001, from Molly S. Williams, a vocational expert. Ms. Williams reviewed the reports of Drs. Demeter and Van Auken and accepted those reports for purposes of rendering her disability opinion. Ms. Williams found that relator was of advanced age and possesses a high school education completed in the remote past (1961). Ms. Williams found that relator retains no transferable skills. She concluded that relator is permanently and totally disabled.
 {¶ 30} 12. On May 26, 2001, a commission hearing administrator mailed a so-called "vocational letter" required by Ohio Adm. Code4121-3-34(C)(6)(c). This letter advised the parties that claim-file documents had been referred to a vocational expert selected by the commission and that the parties have 45 days from the date of the letter "to submit additional vocational information," or to request a prehearing conference. The letter further listed the potential issues to be discussed at a prehearing conference. Among the issues listed is "Evidence of retirement issues."
 {¶ 31} 13. The hearing administrator referred certain claim-file documents to Bruce S. Growick, Ph.D., so that he could render an Employability Assessment Report. Dr. Growick submitted a vocational report dated June 11, 2001.
 {¶ 32} 14. In his report, Dr. Growick lists seven documents he reviewed. Dr. Hoover's July 20, 1981 report is not among the reports listed.
 {¶ 33} 15. Dr. Growick's report responds to the following query:
 {¶ 34} "Based on your separate consideration of reviewed medical and psychological opinions regarding functional limitations, which arise from the allowed condition(s), identify occupations, which the Claimant may reasonably be expected to perform, (A) immediately and/or (B) following appropriate academic remediation, or brief skill training."
 {¶ 35} Indicating acceptance of the reports of Drs. Demeter and Van Auken, and responding to the above query, Dr. Growick wrote: "Bench Assembly; Machine Tender/Feeder; Offbearer/Packer; Inspector/Quality Assurance."
 {¶ 36} Dr. Growick's report further states:
 {¶ 37} "III. Effects of Other Employability Factors:
 {¶ 38} "1. Question: How, if at all, do the Claimant's age, education, work history or other factors (physical, psychological and sociological) effect his/her ability to meet basic demands of entry level occupations?
 {¶ 39} "Answer: Age: As a middle-aged worker, Claimant should be capable of learning new, entry-level skills for employment.
 {¶ 40} "Education: As a high school graduate, Claimant should be capable of learning new, entry-level skills for employment.
 {¶ 41} "Work History: Claimant should be capable of adapting to production work in a factory board [sic] upon his work history.
 {¶ 42} "* * *
 {¶ 43} "2. Question: Does your review of background data indicate whether the Claimant may reasonably develop academic or other skills required to perform entry level Sedentary or Light jobs?
 {¶ 44} "Answer: Claimant should be capable of learning new, entry-level skills for employment."
 {¶ 45} 16. On July 1, 2001, Ms. Williams issued an addendum report indicating that she was responding to Dr. Growick's report. She wrote:
 {¶ 46} "* * * [O]nce again, when the disability factors are correctly identified, stated, and considered without prejudice: an individual unable to perform his customary past relevant work; an individual of advanced age (fifty-five or over); an individual with a high school education completed in the remote past (1961); an individual with no recently completed additional education (within the past fifteen years); an individual with no transferable skill(s); and an individual unable (or expected) to perform other work based upon his allowed physical impairment(s) as assessed by The Industrial Commission's Specialist, Stephen L. Demeter, M.D., it is obvious that the claimant is permanently and totally disabled."
 {¶ 47} 17. Relator's PTD application was heard on July 11, 2001 by a commission staff hearing officer ("SHO"). The hearing was recorded and transcribed for the record. Relator was present with counsel and he testified.
 {¶ 48} 18. The hearing transcript discloses the following exchange between relator's counsel and the SHO:
 {¶ 49} "[Relator's counsel] And Dr. Hoover, who examined on the question of the initial allowance, whose report was relied upon back when the additional psychological condition was recognized, administered psychological testing — —
 {¶ 50} "[Hearing officer] Okay. That's going awful far back to be reliable in the proceeding, unless you have some urgent reason for citing it.
 {¶ 51} "[Relator's counsel] And I'll get to that immediately. The reason why I'm citing it is that Dr. Hoover administered the Wechsler Adult Intelligence Scale which showed a score of 83. This patient's performance is exceeded by 86 percent of the population, which puts him in the 14th percentile based upon that score.
 {¶ 52} "* * *
 {¶ 53} "[Relator's counsel] What I was going to say was, according to the Supreme Court in States versus Hall, intellectual functioning is a disability factor which must be considered, which I don't think the vocational reviewer did either."
 {¶ 54} 19. Following the July 11, 2001 hearing, the SHO issued an order denying the PTD application. The SHO's order of July 11, 2001 states in part:
 {¶ 55} "The Staff Hearing Officer finds that the claimant is not entitled to permanent total disability for two reasons.
 {¶ 56} "First the claimant has failed to establish by the preponderance of the evidence that his retirement was caused by the allowed conditions in his workers' compensation claims and, therefore [it was] involuntary.
 {¶ 57} "* * * [The SHO discusses State ex rel. McAtee v. Indus. Comm. (1996), 76 Ohio St.3d 648.]
 {¶ 58} "The Staff Hearing Officer finds that the same rationale applied by the Court in McAtee, supra applies to the facts in this case. The claimant herein asserts that his retirement was precipitated by his injuries, but he offers no medical proof to support his assertion. The evidence on record shows little treatment was rendered on account of the allowed conditions and very little time was lost from work. If indeed the claimant had been disabled by his injuries, he could have received temporary disability, but he never filed for this benefit. Just as in McAtee, the claimant had a choice between disability retirement and regular retirement, but he chose regular retirement.
 {¶ 59} "The absence of medical proof supporting disability causally related to the claimant's injuries at the time of his retirement, and the fact that he elected to take a regular retirement instead of a disability retirement leads this hearing officer to the conclusion that his retirement was in no way related to his injuries. Because the retirement is not related to the claimant's injuries and occurred prior to his filing for permanent total disability, the retirement is voluntary. As such, the claimant's retirement bars the receipt of permanent total disability.
 {¶ 60} "The Staff Hearing Officer also finds that this claimant is not entitled to permanent total disability because the medical evidence does not establish that his disability is total. In the context of permanent total disability the word total means an inability to perform any sustained remunerative employment. If there is some work that the claimant can do, even if he has to be retrained for the alternate work, his disability is not total. The Staff Hearing Officer's finding is based upon Dr. Demeter's report of April 6, 2001, Dr. Van Auken's report of April 17, 2001, and Mr. Bruce Growick's employability assessment of June 11, 2001.
 {¶ 61} "* * *
 {¶ 62} "Based upon the reports of Dr. Van Auken and Dr. Demeter the Staff Hearing Officer finds that the claimant retains the ability to engage in sedentary work[.] [S]ince the claimant retains the physical ability to engage in some work activity[,] the Staff Hearing Officer must evaluate the claimant's nonmedical disability factors to see if they combine with the claimant's physical impairment to permit or foreclose employment. The relevant nonmedical disability factors are the claimant's age, education, and past work history.
 {¶ 63} "According to the claimant's testimony, he is a fifty-eight year old high school graduate who can read, write, and do basic math. His past relevant work history consisted of employment with the City of Kent in its water treatment facility as a water treatment specialist. When Dr. Van Auken questioned the claimant about his past employment at the water treatment plant he replied, `I didn't care too much for it, but it was the only thing I could do, I couldn't bend or walk around much.' It would appear that this work was lighter than the claimant's previous welding position because the claimant was able to maintain this employment for twenty-seven years after his injury. In 1970 the claimant worked as a deputy sheriff for one year. Although this job was performed many years ago, it required knowledge of criminal law, the ability to work with people, and the ability to follow set regulations.
 {¶ 64} "Dr. Bruce Growick, Ph.D., performed an employability assessment wherein he considered the claimant's nonmedical disability factors along with the medical reports of Dr. Demeter and Dr. Van Auken. Dr. Growick opined that the claimant was currently suited for employment as a bench assembler, machine tender feeder, packer, and an inspector in quality assurance. The claimant's age, education, and past work history all would permit him to learn new skills necessary for entry-level sedentary work.
 {¶ 65} "The Staff Hearing Officer accepts Dr. Growick's findings and concludes that the claimant's nonmedical disability factors do not foreclose the claimant from performing entry-level sedentary work. The claimant's current age is not a negative factor because it does not impair the claimant's ability to learn new skills or do work in competition with others. The fact that the claimant completed high school is a positive factor in that it provided him with the ability to read, write, and do basic math. Moreover, a high school education is all that is required for entry-level sedentary work. While the claimant's past work was not sedentary, the fact that the claimant was able to maintain it for twenty-seven years after the injury, demonstrates that he acquired a strong work ethic, is able to get along with people, and can follow instructions. These strong worker traits coupled with the claimant's ability to learn new skills outweigh the lack of skills that are directly transferable to sedentary work. Based upon the foregoing factual findings, the Staff Hearing Officer determines that the claimant is able to engage in entry-level work, therefore, his disability is not total."
 {¶ 66} 20. On December 31, 2001, relator, Thomas Bozeman, filed this mandamus action.
Conclusions of Law:
 {¶ 67} The commission gave two reasons for denial of relator's PTD application: (1) his retirement was voluntary; and (2) he can perform sustained remunerative employment. Relator challenges both bases for denial of his application.
 {¶ 68} The magistrate finds that the commission did not abuse its discretion in determining that relator can perform sustained remunerative employment, but the commission did abuse its discretion in finding that the retirement was voluntary. While the commission has, in effect, given alternative bases for denial of the application, the voluntary retirement finding can have a binding effect upon a future PTD application. Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to correct its finding that the retirement was voluntary.
 {¶ 69} Relator only challenges the commission's nonmedical analysis with respect to its determination that he can perform sustained remunerative employment. Relator contends that the nonmedical analysis is flawed because the commission's order fails to accept or even address Dr. Hoover's July 1981 reporting of relator's score on the Wechsler Adult Intelligence Scale ("WAIS").
 {¶ 70} This contention is founded upon relator's assertion that the WAIS score indicates "diminished intellectual capacity" and that evidence of such allegedly presents a so-called Stephenson factor that the commission is obligated to address in its nonmedical analysis. Relator relies solely upon State ex rel. Hall v. Indus. Comm. (1997),80 Ohio St.3d 289, for his proposition that evidence of diminished intellectual capacity is a Stephenson factor that must be specifically addressed in the commission's order. As more fully explained below, relator's reliance upon Hall is misplaced.
 {¶ 71} To begin, in State ex rel. Stephenson v. Indus. Comm. (1987), 31 Ohio St.3d 167, 172-173, the court states:
 {¶ 72} "We reiterate that the determination of permanent total disability, and whether or not the claimant could return to any other remunerative employment, is an ultimate finding, totally within the province of the commission. We hold it to be necessary that the commission look at the claimant's age, education, work record, and all other factors, such as physical, psychological, and sociological, that are contained within the record in making its determination of permanent total disability."
 {¶ 73} The Stephenson holding is now embodied in Ohio Adm. Code4121-3-34(D)(2)(b) which states:
 {¶ 74} "If, after hearing, the adjudicator finds that the claimant, based on the medical impairment resulting from the allowed conditions is unable to return to the former position of employment but may be able to engage in sustained remunerative employment, the non-medical factors need be considered by the adjudicator.
 {¶ 75} "The non-medical factors that are to be reviewed are the claimant's age, education, work record, and all other factors, such as physical, psychological, and sociological, that are contained within the record that might be important to the determination as to whether the claimant may return to the job market by using past employment skills or those skills which may be reasonably developed. (Vocational factors are defined in paragraph (B) of this rule)."
 {¶ 76} Age is a Stephenson factor that must always be addressed in the commission's nonmedical analysis. Ohio Adm. Code 4121-3-34(B)(3)(a) states: " `age' shall be determined at the time of the adjudication of the application for permanent and total disability." It has been held that age must be considered on a case-by-case basis and that age must never be viewed in isolation. State ex rel. Moss v. Indus. Comm. (1996),75 Ohio St.3d 414.
 {¶ 77} Education is also a Stephenson factor that the commission must address in its nonmedical analysis. Ohio Adm. Code 4121-3-34(B)(3)(b) states:
 {¶ 78} " `Education' is primarily used to mean formal schooling or other training which contributes to the ability to meet vocational requirements. The numerical grade level may not represent one's actual educational abilities. If there is no other evidence to contradict it, the numerical grade level will be used to determine educational abilities."
 {¶ 79} It has been held that the commission's failure to address the claimant's education in its discussion of the nonmedical factors renders its analysis incomplete. State ex rel. Byrd v. Am. Std., Inc. (1997), 78 Ohio St.3d 504, 507.
 {¶ 80} The claimant's work record is also a Stephenson factor that ordinarily must be addressed by the commission in its nonmedical analysis. Ohio Adm. Code 4121-3-34(B)(3)(c)(v) states: "The relevance and transferability of previous work skills are to be addressed by the adjudicator."
 {¶ 81} Obviously, factors other than age, education and work history can be relevant to the commission's nonmedical analysis. However, it is the commission that renders the analysis. Its analysis is not necessarily controlled by the evidence that the claimant wishes the commission to accept.
 {¶ 82} In Hall, the commission denied the claimant's PTD application stating:
 {¶ 83} "* * * The claimant's education (completed the 6th grade and is functionally illiterate) and his previous work history (laborer, timber cutter, industrial production worker, and construction) would be barriers to rehabilitation and retraining to more sedentary employment. However, the claimant is only 53 years old and * * * young enough * * * to make retraining and rehabilitation a probability. * * *" Id. at 291.
 {¶ 84} The Hall court found the commission's nonmedical analysis to be flawed, stating:
 {¶ 85} "* * * The commission's decision was based on claimant's age, a factor which the commission felt made claimant amenable to retraining. Age, however, is immaterial if claimant lacks the intellectual capacity to learn. The claimant has a sixth-grade education and is illiterate. His work history consists entirely of extremely heavy physical labor that is now well beyond his physical capacities. There is no explanation as to how or for what jobs claimant is able to retrain." Id. at 292.
 {¶ 86} Contrary to relator's suggestion here, the Hall case does not stand for the proposition that the commission is obligated to address evidence of so-called diminished intellectual capacity in its nonmedical analysis. In Hall, it was the commission's order that found the claimant to be "functionally illiterate." The Hall court criticized the logic of the commission's conclusion that the claimant's age alone can overcome the illiteracy problem which may be indicative that the claimant lacks the capacity to learn.
 {¶ 87} There is a presumption of regularity that attaches to commission proceedings. State ex rel. Lovell v. Indus. Comm. (1996),74 Ohio St.3d 250, 252. That gives rise to a second presumption — that the commission considered all the evidence before it. Id.
 {¶ 88} Here, at the July 11, 2001 hearing, relator's counsel argued for commission acceptance of Dr. Hoover's reporting of the WAIS score. The SHO's response indicates two things: (1) the hearing officer was already familiar with Dr. Hoover's report; and (2) the hearing officer felt that the report was no longer time relevant to the PTD issues at hand.
 {¶ 89} Contrary to relator's suggestion here, the SHO's failure to address Dr. Hoover's report in the order does not indicate that the report was not considered. To the contrary, there is a presumption that Dr. Hoover's report was considered by the SHO and that he simply refused to accept the July 1981 WAIS scores as being time relevant to the PTD proceedings. It was clearly within the commission's fact-finding discretion to question the current reliability of the WAIS scores and to refuse to accept it as evidence to be relied upon. See State ex rel. Hiles v. Netcare Corp. (1996), 76 Ohio St.3d 404, 407.
 {¶ 90} Accordingly, the magistrate finds no abuse of discretion with the commission's finding that relator can perform sustained remunerative employment.
 {¶ 91} Turning to the retirement issue, Ohio Adm. Code4121-3-34(D)(1)(d) states:
 {¶ 92} "If, after hearing, the adjudicator finds that the claimant voluntarily removed himself from the work force, the claimant shall be found not to be permanently and totally disabled. If evidence of voluntary removal or retirement is brought into issue, the adjudicator shall consider evidence that is submitted of the claimant's medical condition at or near the time of removal/retirement."
 {¶ 93} Paragraphs two and three of the syllabus of State ex rel. Baker v. Indus. Comm. (1994), 69 Ohio St.3d 202, state:
 {¶ 94} "An employee who retires prior to becoming permanently and totally disabled is precluded from eligibility for permanent total disability compensation only if the retirement is voluntary and constitutes an abandonment of the entire job market. * * *
 {¶ 95} "An employee who retires subsequent to becoming permanently and totally disabled is not precluded from eligibility for permanent total disability compensation regardless of the nature or extent of the retirement. * * *"
 {¶ 96} Here, the commission reviewed McAtee in its order. That case is instructive. Many years after suffering a knee injury that resulted in several unsuccessful surgeries and ultimately a fusion operation that left him unable to bend the knee at all, McAtee retired from his employment at Chrysler Corporation at age 62. Given the option of "permanent total disability retirement" and "early retirement at employee option," McAtee chose the latter. McAtee also applied for regular, not disability, Social Security benefits at that time. McAtee filed for PTD compensation two years after his retirement from Chrysler. He did not seek other employment following his departure from Chrysler.
 {¶ 97} The McAtee court stated: "His early retirement and receipt of Social Security benefits, his application for pension benefits, and his failure to seek other employment following his departure from Chrysler, all demonstrate his intent to leave the labor force." Id. at 651.
 {¶ 98} Here, the key part of the commission's order addressing retirement bears repeating:
 {¶ 99} "The Staff Hearing Officer finds that the same rationale applied by the Court in McAtee, supra applies to the facts in this case. The claimant herein asserts that his retirement was precipitated by his injuries, but he offers no medical proof to support his assertion. The evidence on record shows little treatment was rendered on account of the allowed conditions and very little time was lost from work. If indeed the claimant had been disabled by his injuries, he could have received temporary disability, but he never filed for this benefit. Just as in McAtee, the claimant had a choice between disability retirement and regular retirement, but he chose regular retirement.
 {¶ 100} "The absence of medical proof supporting disability causally related to the claimant's injuries at the time of his retirement, and the fact that he elected to take a regular retirement instead of a disability retirement leads this hearing officer to the conclusion that his retirement was in no way related to his injuries. Because the retirement is not related to the claimant's injuries and occurred prior to his filing for permanent total disability, the retirement is voluntary. As such, the claimant's retirement bars the receipt of permanent total disability."
 {¶ 101} The magistrate identifies two flaws in the commission's reasoning that the retirement was voluntary: (1) the commission mischaracterizes the issue and the record by concluding that the record "shows little treatment was rendered on account of the allowed condition"; and (2) the commission incorrectly assumes that if relator had been unable to perform his job at the time of his retirement he would have been entitled to temporary total disability ("TTD") compensation.
 {¶ 102} Ohio Adm. Code 4121-3-34(D)(1)(d) requires the commission to consider evidence of relator's medical condition at or near the time of retirement. Here, the PTD application was premised primarily on the psychological claim allowance. Hence, the commission was required to focus its consideration upon the evidence of relator's psychological condition at or near the time of his retirement. The commission seems not to have done so but to have simply viewed treatment generally over the life of the claim as to all allowed conditions.
 {¶ 103} Moreover, on December 18, 2000, some three months after the retirement, treating psychiatrist Dr. Menassa indicated that he had been seeing relator at monthly intervals since 1996 and that treatment (psychotherapy and medication) will have to continue for an indefinite period of time.
 {¶ 104} Given the record of psychological treatments indicated in Dr. Menassa's report, it is inaccurate to conclude that relator has received "little treatment" for this condition.
 {¶ 105} Furthermore, relator filed his PTD application on January 12, 2001, some four months after he retired. His application was supported by evidence of PTD dated some three months after retirement. The PTD application in effect, constitutes relator's claim that he was unable to return to his former position of employment. The commission's order here fails to recognize the relatively short duration between the retirement date and the PTD application.
 {¶ 106} As relator points out, he had been treated for many years by his psychiatrist for his psychological condition. As early as May 14, 1996, Dr. Aronson suggested that the condition was at maximum medical improvement. On December 18, 2000, some three months after retirement, Dr. Menassa certified that the condition was considered "chronic."
 {¶ 107} It is well-settled that entitlement to TTD compensation ceases when the injury has reached a state of permanency or maximum medical improvement. State ex rel. Eberhardt v. Flxible Corp. (1994),70 Ohio St.3d 649, 653.
 {¶ 108} Here, the commission's order incorrectly assumes that relator's failure to seek postretirement TTD compensation is evidence that he could perform his former position of employment at the time of retirement and thus shows the retirement to be voluntary. The commission's reasoning is flawed because it fails to consider that PTD was applied for shortly after the retirement and that relator would not be entitled to TTD benefits if the condition were at maximum medical improvement at the time of his retirement.
 {¶ 109} Given the flaws in the commission's reasoning regarding the determination of a voluntary retirement, the commission must vacate its determination that the retirement was voluntary and redetermine the issue in a manner consistent with law.
 {¶ 110} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate that part of its July 11, 2001 order that determines relator's retirement to be voluntary, and to enter a new determination in a manner consistent with this magistrate's decision.